## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDY MAGEE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-1858** |
| **BURL CAIN, WARDEN** | **SECTION "A" (6)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2).  Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY[1]

Petitioner, Andy Magee, was indicted for the second degree murder of Johnny Cook in violation of La. R.S. 14:30.1.  Petitioner pled not guilty.  A jury was impaneled and, after a two-day trial, the jury found petitioner guilty as charged.  Petitioner was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

The Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and sentence.  *State v. Magee*, No. 2003-KA-0071 (La. App. 1 Cir. Sept. 26, 2003) (unpublished opinion).  Thereafter, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final.  *State v. Magee*, 869 So.2d 816 (La. 2004).

Following the completion of his direct appeal proceedings, petitioner sought state post-conviction relief.  Petitioner's efforts in this regard culminated on January 27, 2006, when the Louisiana Supreme Court denied his writ application.  *State ex rel. Magee v. State*, 922 So.2d 533 (La. 2006).

On February 27, 2006, petitioner filed the instant petition for writ of habeas corpus, raising the following claims:  1) His due process rights were violated when the

---

[1]A portion of the procedural history was taken from the Louisiana First Circuit Court of Appeal's direct appeal decision, *State v. Magee,* No. 2003-KA-0071 (La. App. 1 Cir. Sept. 26, 2003) (unpublished opinion), a copy of which is contained in the State rec., vol. 4 of 4.

2

prosecutor, during voir dire, sought commitments from prospective jurors regarding their ability to return a guilty verdict; 2) his constitutional rights were violated by virtue of a juror's failure to divulge, during voir dire, that his mother and son were victims of crime; 3) the trial court erred in failing to excuse for cause two jurors, one of whom petitioner was forced to use a peremptory challenge to excuse and the other of whom petitioner was forced to accept because he had exhausted his peremptory challenges; 4) his constitutional rights were violated when the prosecution introduced "other crime evidence" without advanced notice or a *Prieur* hearing; 5) insufficient evidence was presented to sustain his conviction; and, 6) he was denied effective assistance of trial and appellate counsel.  In its response (rec. doc. 12, p. 2), the State does not contest the timeliness of the instant action and concedes that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  Accordingly, this court shall proceed to review the pertinent facts, then address the merits of petitioner's claims.

**II.  FACTS**[2]

On the night of September 7, 2000, Pansy Tyson was awakened by noises outside her home.  She then heard someone screaming for help and knocking on her door. Frightened, Tyson called 911.  Deputy Wendell O'Berry of the Bogalusa City Police

---

[2]The facts are taken from the state appellate court's opinion on direct appeal, *State v. Magee*, No. 2003-KA-0071 (La. App. 1 Cir. Sept. 26, 2003) (unpublished opinion).

3

Department testified that Tyson told 911 operators that a bleeding, black male came to her door asking for help.  In the meantime, 911 operators received a hang-up call from the home across the street from Tyson's, 1503 Hickory Avenue in Bogalusa.

Deputy O'Berry knocked on the door at 1503 Hickory Avenue, and the door partially opened.  Johnny Cook was sitting on the edge of the couch near the door bleeding profusely.  Deputy O'Berry called for an ambulance and asked Cook what happened.  Cook responded that "someone came in on [him]" and, when prompted, indicated it was a black male.  Deputy O'Berry asked Cook if Cook knew the perpetrator, and Cook started shaking his head.  Deputy O'Berry testified that Cook appeared to be going into shock, was passing in and out of consciousness, and gave Deputy O'Berry the impression that he knew who had injured him but did not want to tell Deputy O'Berry who the perpetrator was.  Deputy O'Berry additionally testified that there were no signs of a forced entry into the home and that there was blood throughout the home.

Lieutenant Scott Adams of the Bogalusa City Police Department also went to the scene that night.  He testified that there was blood on the outside steps and on the floor of the porch, and blood on the bed, floor and wall of the bedroom.  While looking for evidence, Lieutenant Adams retrieved a condom floating in the toilet, a pair of tennis shoes on the bedroom floor, and a hammer on the bedroom floor.  Family members at the house at the time told Lieutenant Adams that the tennis shoes definitely did not belong to the victim

as the tennis shoes were dirty, worn, covered in wet grass clippings, and askew on the floor while all of the victim's shoes were clean and neatly placed in the closet.

Cook's sister, Shelia Marie Cook, testified that Cook was homosexual, but was very "private and particular about his mates" and did not make his sexual orientation known to the community.  Although Cook was transported to the hospital by ambulance, he died later that night.

Dr. William Newman, an expert witness in the field of forensic pathology, testified that the victim had been shot three times:  a non-fatal wound to the head that did not penetrate the skull, a non-fatal wound through the left arm and into the chest, and a fatal wound through the right arm that penetrated the lung, diaphragm, liver and ended near the kidney.  According to Dr. Newman, the victim's cause of death was blood loss as well as collapse of the lung due to an accumulation of blood in the chest cavity.  The doctor recovered three bullets from the victim's body.

The day following Cook's murder, a neighbor, Jacque Williams, was doing yard work when he found a set of keys in a shed behind his house.  Williams called the police and the keys were ultimately identified as belonging to the victim.

On the morning following the murder, Lieutenant Adams was searching an alley that ran between the victim's house and Jacque Williams' home.  Lieutenant Adams testified that he found two shirts thrown on the side of the alleyway.

5

Jacque Williams, upon entering his shed on a later date, discovered a gun hidden in a box under several empty milk jugs.  Williams again called police, and Officer Tommie Sorrell of the Bogalusa City Police Department arrived to retrieve the weapon, a .22 caliber pistol.  Officer Sorrell testified that the .22 pistol contained four spent shell casings, one live .22 hollow-point round, and one empty chamber.

Sergeant Ortho Stubbs of the St. Tammany Parish Sheriff's Office Crime Lab testified that four bullets had been fired from the .22 handgun and that the remaining live round possessed a firing pin impression indicating that there was an attempt to fire the gun resulting in a misfire.  Moreover, Sergeant Stubbs testified that two of the three bullets recovered from the victim's body had been fired from the .22 handgun, while the third bullet was too badly damaged to make a comparison.

A few days after the murder, Mr. L.C. Pittman came to the police station to report a stolen .22 handgun.  Pittman normally kept the handgun in a sock in a shoe under the television set in the living room.  Pittman testified that when he heard about the shooting, he immediately checked on the handgun and discovered it was missing.  It was Pittman's belief that Andy Magee, who had stayed at the Pittman home the night before and the night of the murder, had taken the handgun.  Lieutenant Adams testified that Pittman advised that during Magee's visit, he had shown Magee the gun.

Versie Pittman who, during the time at issue lived with her brother, L.C.

6

Pittman, testified that she had given Andy Magee a pair of black tennis shoes that had belonged to her grandson and a shirt to wear since Magee's clothes were so worn and dirty. At the police station, L.C. and Versie Pittman were asked to look at the gun retrieved from Jacque Williams' shed, the pair of tennis shoes retrieved from the bedroom floor of the victim, and one of the shirts found in the alleyway that ran behind the victim's home and Williams' home. They identified the gun as being the handgun that went missing from their home during Andy Magee's stay, and the shoes and shirt as those given to Andy Magee by Versie and worn by him during his stay with them. They also identified these items in court during trial.[3]

Natasha Poe of the State Police Crime Lab, an expert witness in the field of forensic DNA analysis and serology, testified that she compared samples of the victim's and the defendant's DNA to DNA obtained from the condom found floating in the victim's toilet. According to her report introduced into evidence, the DNA on the condom was a mixture of DNA from at least two individuals and neither Johnny Cook nor Andy Magee could be excluded as donors of that DNA mixture. Specifically, it was 3,180 times more likely to be a mixture of DNA from Johnny Cook, Andy Magee and one unknown individual than a mixture of DNA from Johnny Cook and two unknown individuals. Additionally, Poe testified that Magee's DNA contained a very rare allele not seen before in the state database

---

[3]The second shirt found in the alleyway was identified by the victim's family members as belonging to the victim.

and only reported one other time in a national database.  This allele was present in the DNA mixture found on the condom.  Turning to the tennis shoes found in the victim's bedroom and identified by Versie Pittman as being the same shoes she gave to Andy Magee, Poe testified that the defendant could not be excluded as a contributor of DNA collected from the shoes.  Specifically, the DNA collected from the shoes indicated the presence of DNA from at least two individuals and it was 74,972 times more likely that it was a mixture of the defendant's and an unknown individual's DNA than a mixture of DNA from two unknown individuals.  Poe added that the DNA taken from the shoe also contained the rare allele present in defendant's DNA.

Lieutenant Adams also testified that a family member of the victim contacted him about a week after the murder and indicated that Clarence Thomas had information about the crime.  Lieutenant Adams obtained a taped statement from Thomas.

In that statement, Thomas told Lieutenant Adams that he and his cousin, Ryan Jefferson, were walking down the street one night when they saw Johnny Cook and Andy Magee arguing outside of Cook's house.  According to Thomas, he heard Magee telling the victim that he owed Magee money for "going with him" and "[giving] him some ... booty." Thomas told Lieutenant Adams that he saw Magee holding a short, black handgun and the victim trying to protect himself with a hammer.  The men continued the exchange on the porch, and Thomas saw Magee shoot the victim in the head.  The victim began calling for

help and, according to Thomas's statement to Lieutenant Adams, Thomas asked Jefferson to help, but Jefferson refused.  Thomas told Lieutenant Adams he heard a total of four gunshot wounds.  Thereafter, Andy Magee came outside, crossed the street, and told Thomas that he would kill him if Thomas told anyone what he had seen.

At trial, Thomas, a graduate of special education classes, was called by the State to testify after being found competent to testify by the trial court.  Thomas testified that his girlfriend is the daughter of one of the victim's sisters.  Thomas's version of the events that night that he gave at trial was similar in most respects to that given in his statement to Lieutenant Adams.  Thomas was with his cousin, they saw the defendant and the victim arguing over money, Thomas saw the defendant shoot the victim at least once and heard four shots total, and the defendant afterwards threatened to kill Thomas if he told anyone.  Thomas could not recall at trial seeing a hammer in the victim's hands.  Additionally, at trial, Thomas testified that after Magee left, he knocked on the door of the home of the old lady who lived across the street from the victim and yelled at her to call 911.  Before leaving, he also saw the bloodied victim crawling across the road.

Thomas was also asked about a letter apparently written by him in which he recants his story and states that he did not see anything occur that night.  Thomas testified that the defendant and other prisoners wrote the entire letter and forced him to sign his name to the bottom while they were all in jail together for about half a year on "B block."

The State then called the Warden of the Washington Parish Jail to testify. Warden Royce McGhee informed the jury that both Clarence Thomas and Andy Magee were in "B block" at the same time from March 16, 2001 until July 26, 2001 and that they were free to interact without restriction.

Based on the statement given by Thomas, as well as information and evidence collected from the Pittmans, Jacque Williams' shed, and the victim's home, Lieutenant Adams arrested Andy Magee.  Lieutenant Adams testified at trial that Magee told him upon arrest that he did not know Johnny Cook, had never been to his house, and did not know anything about him.

The defendant called Ryan Jefferson who testified that he was not with Clarence Thomas on the night of the murder.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were

"contrary to, or involved an unreasonable application of clearly established Federal law, as

determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485

(5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant
> the writ if the state court arrives at a conclusion opposite to that reached by
> this Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle from this
> Court's decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210

F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and we

will give deference to the state court's decision unless it `was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## IV.  ANALYSIS

### Claim 1):  Improper Voir Dire Questioning

Petitioner claims that his constitutional right to a fair and impartial jury panel

was violated by virtue of the prosecutor's questions to prospective jurors which, according

to petitioner, "committed them to a guilty verdict even before any evidence had been

introduced.    The prosecutor's hypothetical questions elicited a pre-commitment."[4]

Specifically, the questions about which petitioner complains are as follows:

PROSECUTOR:

Q. Ms. Forbes, would you have trouble convicting a defendant if the state proves him guilty beyond a reasonable doubt?  Would you have trouble convicting him simply because the sentence was for life?

PROSPECTIVE JUROR:

A.  No.

PROSECUTOR:

Q:  Okay.  Ms. Hartfield?

PROSPECTIVE JUROR:

A.  If you proved it beyond a reasonable doubt.[5]

PROSECUTOR:

Q:  Finally, I want to ask each one of you if the state proves every element of the crime of second degree murder beyond a reasonable doubt, will you be able to return a verdict of guilty?[6]

In addressing the instant claim in connection with petitioner's post-conviction application, the state district court reasoned that while "voir dire examination is not for the purpose of prying into the jurors' personal opinions or eliciting commitments concerning the evidence to be presented at trial ... counsel is permitted to ask any and all questions deemed helpful to learning if the juror is favorable to the theory of the case, even if it means probing

---

[4] *See* Rec. doc. 1, petitioner's supporting memorandum at p. 8.

[5] *See* State rec., vol. 2 of 4, pp. 218-219

[6] *See* State rec., vol. 2 of 4, p. 273.

private opinions."[7]  With regard to the colloquy set forth above, the court determined:

> [T]he Prosecutor is asking general questions about whether the prospective jurors could abide by the legal principle of law regarding proof beyond a reasonable doubt.  With regard to Ms. Forbes however, the Prosecutor is attempting to probe into her private opinion regarding the issuance of a life sentence.  As such, the questions posed seek not a commitment but an opinion.  This type of question is permissible ... and does not violate the Petitioner's rights to due process.[8]

To the extent petitioner suggests that the prosecutor's voir dire questions were contrary to state law, his claim is not cognizable on federal habeas review.  It is well established that federal habeas review is limited to questions of constitutional dimension.  *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).

Under the Constitution, a defendant has a right to trial "by an impartial jury."  U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury of the State and district wherein the crime shall have been committed").  As the court explained in *Bowers v. Dretke*, 2005 WL 2045566, *6 (S.D.Tex Aug. 25, 2005) (quotation omitted), "[c]ommitment questions require a potential juror to

---

[7]*See* State rec., vol. 4 of 4, state district court's "Dismissal without Answer of Application for Post Conviction Relief" at p. 2.

[8]*See* State rec., vol. 4 of 4, state district court's "Dismissal without Answer of Application for Post Conviction Relief" at p. 3.

promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all the evidence in context. An improper commitment question attempts to create a bias or prejudice before the juror has heard the evidence." In contrast, "a proper voir dire question attempts to discover a potential juror's preexisting bias or prejudice." *Id.* (Citation omitted).

In the instant matter, the pertinent voir dire questions clearly represent the prosecutor's attempt to discover if the potential jurors had a preexisting bias against the imposition of a life sentence. As the state district court noted, the voir dire questions posed did not seek "a commitment but [rather] an opinion." As such, as the state court concluded, the questions were clearly "permissible" and did "not violate the Petitioner's rights to due process."

### Claim 2): Juror Failed to Divulge that Mother and Son Were Crime Victims

Petitioner argues that he was denied his right to a full and complete voir dire examination and his right to an impartial jury based upon the fact that a juror, Mr. Albert Ryals, who ultimately served as jury foreman, did not divulge, during voir dire examination, that his son and mother were crime victims. A review of the pertinent transcript reflects that the jury panel was asked whether or not they or anyone they knew had been crime victims and Mr. Ryals did not speak up on this issue.[9] However, further review of the transcript

---

[9]*See* State rec., vol. 1 of 4, pp. 139-145.

reveals that Mr. Ryals' failure in this regard was based not upon any dishonesty on his part, but rather, upon mere oversight.

Once trial had commenced, immediately following a lunch break, Juror Ryals, via a bailiff, informed the trial judge that he needed to speak with him. During this discussion, Ryals explained to the trial judge that he was born and raised in Tylertown, Mississippi, and reference to the town, made during the morning's trial testimony, triggered his memory with respect to crimes allegedly committed against two of his family members by the grandson of John Magee, a tenant farmer on Ryals' father's farm. Specifically, the grandson, who Ryals believed could have been the petitioner or a member of petitioner's family, was suspected of killing Ryals' mother's dog and of breaking into Ryals' son's car and taking $1800.00 from a purse that had been left in the car.[10]

Based upon the above information, defense counsel spoke with petitioner's mother and it was established that neither petitioner nor any member of petitioner's family had any connection to any Magees who had ever lived in Tylertown, Mississippi.[11] Once this fact was established, Ryals informed that he had "no problem" serving as a fair and impartial juror.[12]

---

[10] *See* State rec., vol. 2 of 4, pp. 350-351.

[11] *See* State rec., vol. 2 of 4, pp. 351-353.

[12] *See* State rec., vol. 2 of 4, p. 354.

In the factually similar case of *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 550, 104 S.Ct. 845, 847, 78 L.Ed.2d 663 (1984), a case which petitioner relies upon in support of the instant argument, prospective jurors were asked during voir dire whether they or any members of their family had "sustained any severe injury ... that resulted in any disability or prolonged pain and suffering...."[13] Ronald Payton, who ultimately became a juror, did not respond to this question.  It was later ascertained that Payton's son had suffered a broken leg as a result of an exploding tire and that Payton did not mention the incident during voir dire because he considered it a common childhood accident which did not fall under the "severe injury" category. *Greenwood*, 464 U.S. at 552, 104 S.Ct. at 848.

The Supreme Court, in reversing the appellate court's decision that the Greenwoods, by virtue of Mr. Payton's non-disclosure of his son's accident during voir dire, were entitled to a new trial, reasoned:

> To invalidate [a] ... trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.  A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination....  We hold that to obtain a new trial in such a situation, a party must first demonstrate that a

---

[13]In *Greenwood*, *supra*, Billy Greenwood and his parents sued McDonough Power Equipment, Inc, ("McDonough") for damages Billy suffered when his feet came in contact with the blades of a riding lawnmower manufactured by McDonough.

> juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Greenwood*, 464 U.S. at 555-556, 104 S.Ct. at 849-850.

In the instant matter, petitioner has clearly failed to satisfy the above two-prong test which would warrant the granting of habeas relief, thereby entitling him to a new trial. The fact that Juror Ryals came forward in the middle of trial to disclose relatively minor criminal incidents involving members of his family that occurred several years ago when his memory of these incidents was triggered by trial testimony, reflects that his non-disclosure of these incidents, during voir dire, was not precipitated by any dishonesty on his part. Further, as the trial court noted, in addressing this issue in connection with petitioner's post-conviction application, Mr. Ryals, after learning that there was no connection between petitioner and the long ago criminal incidents, "acknowledged he could be fair and impartial."[14]  Specifically, a review of the trial transcript reflects the following exchange:

THE COURT:
You're telling the Court you don't have any problem being fair and impartial?

---

[14]*See* State rec., vol. 4 of 4, "Dismissal Without Answer of Application for Post Conviction Relief" at p. 4.

MR. RYALS:

    Right.[15]

Accordingly, petitioner clearly cannot satisfy the second prong of the test because even if

these earlier criminal incidents involving Ryals' family members had been revealed during

voir dire, it would not have provided petitioner with a valid basis for a challenge of Ryals for

cause.  Because these earlier crimes did not affect Ryals' impartiality, their non-disclosure

during voir dire did not affect the fairness of petitioner's trial and, as such, does not warrant

the granting of habeas corpus relief.

### Claim 3):  Trial Court Erred in Failing to Excuse Two Jurors for Cause

    Petitioner argues that the trial court erred in denying his request to excuse two

prospective jurors for cause.  Petitioner raised this same claim in connection with his direct

appeal and the Louisiana First Circuit, in analyzing said claim, examined the applicable facts.

    First, the defense objected to juror Christina Crutti on the basis that her
son and her sister had been murdered in two separate incidents one and three
years prior to the defendant's trial.  The transcript shows Ms. Crutti informed
the court her son was shot and killed in New Orleans on June 11, 1999, and
that someone had been caught but not brought to trial yet.  When asked if that
would prevent her from being impartial, she said, "I don't think so."  Ms.
Crutti subsequently mentioned that her sister had been murdered in September
of 2001 in Oklahoma City and that a trial was pending.  The trial court again
asked Ms. Crutti if this would affect her ability to serve as a juror, to which she
replied in the negative.

    Later, the defense asked the trial court to excuse Ms. Crutti for cause,

---

[15]*See* State rec., vol. 2 of 4, p. 354, lines 5-9.

noting only that "[s]he answered right but she has lost two relatives."  The State responded that there was no hesitation in Ms. Crutti's answers, and the trial court thereafter denied the defendant's motion to strike for cause.  The defendant then used a peremptory challenge to excuse Ms. Crutti from the jury.

The defense also complains in brief about the trial court's refusal to strike Gloria Quillon for cause.  After having exhausted his peremptory challenges, the defense asked the trial court to strike Gloria Quillon for cause because she had once taught the victim.  Ms. Quillon, a retired school teacher, informed the court that she had taught the victim in high school.  Upon questioning, she indicated she had not been particularly close to him and that it would not affect her ability to be a fair and impartial juror.  The State's attorney questioned Ms. Quillon, and she stated that she could not recall how many years ago she had taught the victim, that she did not stay in contact with him after school, and that she could not recall which particular grade she had taught him.[16]  She reiterated that she could be fair and impartial.  Upon questioning by the defense attorney, Ms. Quillon stated that she did not go to the victim's funeral, that she had no contact with his family, and that she did not remember anything about the victim.  Later, the defense asked the trial court to remove Ms. Quillon for cause.  The trial court denied the motion.

*Magee*, No. 2003 KA 0071 at pp. 9-10 (footnote original).

Under Supreme Court law, a trial court's decision with respect to whether a prospective juror should or should not be struck for cause is entitled to considerable deference as such a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial court's province.  *See Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985).  The same is true with respect to Louisiana law.  As

---

[16]The defendant, in brief, concludes Ms. Quillon taught the victim all four years in high school.  Our review of her testimony, however, indicates instead that she taught him at some point during the victim's term in high school but that she could not remember which grade she taught him because she taught each of the grades at some point during her tenure there.

the state appellate court explained:

> The trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the entire voir dire reveals the court abused its discretion. *State v. Cross*, 93-1189, p. 7 (La. 6/30/95), 658 So.2d 683, 686. A trial court's refusal to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, he has demonstrated a willingness and ability to decide the cases impartially according to the law and the evidence. *State v. Copeland*, 530 So.2d 526, 534 (La. 1988), *cert. denied*, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).

*Magee*, No. 2003 KA 0071 at pp. 10-11.

Applying the above law to the applicable facts, the Louisiana First Circuit

Court of Appeal reasoned:

> Ms. Crutti clearly stated the murders of her son three years ago and her sister one year ago would not affect her ability to be impartial and fair. The trial court was able to observe Ms. Crutti's demeanor during voir dire. Given Ms. Crutti's straightforward answers and a transcript devoid of any other evidence [raising a question as to] Ms. Crutti's alleged impartiality, it was not unreasonable for the trial court to take Ms. Crutti's word under the circumstances. The trial court did not abuse its discretion in refusing to excuse Ms. Crutti for cause.
>
> Similarly, the retired school teacher, Ms. Quillon, indicated she could not recall how many years ago she had taught the victim or what grade she taught him, and, in fact, could not remember anything about him. She stated several times that her having taught the victim would not affect her ability to be a fair and impartial juror. Given the foregoing, the trial court did not abuse its discretion in refusing to excuse Ms. Quillon for cause.

*Magee*, No. 2003 KA 0071 at p. 11.

This court finds that the above reasoning does not represent an unreasonable

20

application of Supreme Court law to the facts of the instant case.  Accordingly, petitioner's

claim for habeas corpus relief is without merit.

### Claim 4):  Introduction of "Other Crime Evidence" Without Advanced Notice

The "other crime evidence" at issue in this case was introduced via the

testimony of L.C. and Versie Pittman who testified that the gun used in the shooting

belonged to them, that petitioner had stayed with them on the night prior to and the night of

the shooting, and that petitioner  knew where their gun was hidden and they suspected that

petitioner had stolen the gun from their home.  Petitioner claims he is entitled to habeas

corpus relief because he was not provided with advance notice that the State planned to

introduce evidence of a separate crime, his alleged stealing of the Pittmans' gun.

It is state law, as opposed to federal law, that requires the prosecution to

provide advance notice of its intent to introduce "other crime evidence".  Specifically, as the

state district court noted in addressing the instant claim in connection with petitioner's post-

conviction application, "La. C.E. art.404(B) governs the admissibility of other crimes,

wrongs or acts."[17]  Article 404(B) provides, in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show that he acted in conformity therewith.
> It may however, be admissible for other purposes, such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity, absence of mistake

---

[17]*See* State rec., vol. 4 of 4, "Dismissal Without Answer of Application for Post Conviction
Relief" at p. 4.

or accident, **provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding**. [Emphasis added.]

In contrast, federal law, specifically, Federal Rule of Evidence 404(b), has no notice requirement in connection with the admission of other crime evidence.  As the Supreme Court noted in *Huddleston v. U.S.*, 485 U.S. 681, 682, 108 S.Ct. 1496, 1497, 99 L.Ed.2d 771 (1988), a case which petitioner relies upon in support of the instant argument, Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As noted earlier, a claim that a prisoner's state court proceeding was violative of state law, in this case, La. C.E. art. 404(B), is not cognizable on federal habeas review.  Such review is limited to questions of constitutional dimension.  *See Jernigan*, 980 F.2d at 298; *Castillo*, 141 F.3d at 222 and 224.  In the instant case, petitioner clearly suffered no constitutional violation.  As the state district court noted, the "'other crime evidence' about which the Petitioner [complains] [was] without question an integral part of the crime charged....  [T]he evidence was not offered to show that the Petitioner [was] a person of bad

character.  Rather, it [was] offered for other purposes such as intent, preparation, plan and identity."[18]  Such purposes are clearly permissible under federal law.  Accordingly, the instant claim for habeas corpus relief is without merit.

### Claim 5):  Insufficiency of Evidence

Petitioner claims that the evidence introduced at trial was insufficient to support his conviction for second degree murder.  In support of his claim, petitioner chiefly attacks the testimony of prosecution witness, Clarence Thomas, "who was the father of a child born to the daughter of the victim's sister, and who was clearly mentally retarded and, therefore, subject to persuasion and suggestion...."[19]

In addressing the instant claim in connection with petitioner's direct appeal, the Louisiana First Circuit examined applicable federal law, along with corresponding state law.

In reviewing the sufficiency of the evidence to support a conviction, an appellate court is governed by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307,  99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Under this standard, the appellate court must determine [whether] the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince any rational trier of fact that all the elements of the crime had been proven beyond a reasonable doubt.  *State v. Cohn*, 00-0313, p. 7 (La. 4/3/01), 783 So.2d 1269, 1275.  Where the key issue is defendant's identity as the perpetrator, rather

---

[18]*See* State rec., vol. 4 of 4, "Dismissal Without Answer of Application for Post Conviction Relief" at p. 5.

[19]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 21.

than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Richardson*, 459 So.2d 31, 38 (La. App. 1st Cir. 1984).

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter goes to the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given is not subject to appellate review, and the appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Savario*, 97-2614, pp. 7-8 (La. App. 1st Cir. 11/6/98), 721 So.2d 1084, 1088-89, *writ denied*, 98-3032 (La. 4/1/99), 741 So.2d 1280.

*Magee*, No. 2003 KA 0071 at p. 7

Thereafter, the state appellate court reviewed the evidence submitted at trial, first noting the evidence which corroborated Thomas's version of events, along with the Pittmans' testimony and the scientific evidence linking petitioner to the murder.

Thomas, in his oral statement to police as well as in his trial testimony, stated that he heard four shots fired. The gun discovered in Jacque Williams' shed, and which ballistics tests proved was the gun used to shoot the victim, contained four empty cartridges even though the victim's body only had three bullet wounds. Only a witness to the crime or a member of law enforcement with information about the empty cartridges in the gun would have had that information.

Although the defendant makes much of the fact that Thomas testified he did not recall two years later seeing the victim holding a hammer, Thomas told Lieutenant Adams one week after the murder that he saw the victim trying to protect himself with a hammer. A hammer was found in the victim's bedroom right next to the victim's bloodstained bed and wall corroborating Thomas's statement to Lieutenant Adams.

The record also shows other corroboration of Thomas's version of events. Thomas testified at trial that he knocked on the door of the "old lady"

24

who lived across the street from the victim and yelled to her to call 911 and that he saw a bloodied Johnny Cook crawling across the street away from his house. Pansy Tyson, a woman who had lived in the house across from the victim for 46 years, testified she heard someone knocking on her door and asking for help. Deputy O'Berry testified that Tyson told 911 operators a bloody, black male was on her porch that night.

In addition to eyewitness testimony, L.C. and Versie Pittman identified shoes found in the defendant's bedroom as a pair Versie had given to Andy Magee a few days before the murder. They also identified a shirt found on a path between the victim's house and the shed where the murder weapon was found as a shirt Versie had given to the defendant along with the shoes. Andy Magee, who told police when arrested that he did not even know Johnny Cook nor had he ever been in Cook's house, could not be excluded as the donor of DNA evidence found on the shoes in Cook's house. The Pittmans also identified the murder weapon as belonging to them and testified, or told police who testified, that they believed the defendant had stolen it from them while he stayed with them the night before and the night of the murder. Finally, the defendant, with his unique DNA allele found in only one other individual on a national DNA database, could not be excluded as the donor of DNA found mixed with that of the victim on the condom in the victim's toilet.

*Magee*, No. 2003 KA 0071 at pp. 7-8.

The court next examined the definition of the crime for which petitioner was convicted.

The killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm is a second degree murder under La. R.S. 14:30.1.A(1). That the defendant had the specific intent to kill Johnny Cook could have been inferred by the jury from the defendant's actions of shooting the victim once in the head, two times in the area of the chest, and, apparently, firing the gun a fourth time at the victim.

*Magee*, No. 2003 KA 0071 at p. 9.

The court concluded:

Viewing the evidence in the light most favorable to the prosecution, we find it to have been more than sufficient to convince any rational trier of fact that all the elements of the crime of second degree murder as well as the defendant's identity as the perpetrator had been proven beyond a reasonable doubt.  This assignment of error lacks merit.

*Magee*, No. 2003 KA 0071 at p. 9.

This court finds that the above reasoning does not represent an unreasonable application of the law enunciated by the Supreme Court in *Jackson*, *supra*, to the applicable facts.  Accordingly, petitioner's claim for habeas corpus relief is without merit.

**Claim 6):  Ineffective Assistance of Trial and Appellate Counsel**

Petitioner claims that he received ineffective assistance of trial counsel by virtue of the following errors on the part of counsel:  1) His failure to object during voir dire to questions from the prosecutor seeking prospective jurors to commit to a guilty verdict; 2) his failure to seek a mistrial based upon Juror Ryals' failure to inform, during voir dire, that his mother and son had been crime victims in the past; and, 3) his failure to object to the prosecution's use of "other crime" evidence.  Petitioner claims that he received ineffective assistance of appellate counsel due to counsel's failure to raise the above-described errors on appeal.

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d

26

674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.[20]

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

In addressing petitioner's ineffectiveness claims in connection with his post-conviction application, the state district court noted the applicable law enunciated by the Supreme Court in *Strickland*, *supra*, then determined that since there was no merit to said

---

[20]To prove that appellate counsel was ineffective, petitioner must satisfy the same two-prong test enunciated in *Strickland* , *supra*, that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) (citations omitted*)* ("The familiar *Strickland* framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").

claims, petitioner had failed to satisfy *Strickland's* two-prong test.[21]   For the following reasons, this court agrees.

First, as noted above, the prosecution, during voir dire, did not employ "commitment questions", in an attempt to create a bias before jurors heard the evidence, but rather, properly sought to discover whether or not prospective jurors had a preexisting bias.[22] Accordingly, counsel was not deficient in failing to object to the prosecutor's voir dire questioning.

Similarly, counsel was not deficient in failing to move for a mistrial due to Juror Ryals' failure to inform, during voir dire, that his mother and son had been past victims.  As noted earlier, Ryals' impartiality was not compromised by virtue of his family members' earlier crime experiences; therefore, petitioner suffered no prejudice by virtue of counsel's failure to seek a mistrial because Ryals was a member of the jury.[23]

Finally, counsel was not deficient in failing to object to the admission of "other crime" evidence, specifically, the Pittmans' testimony regarding their belief that petitioner, who stayed in their home on the night before and the night of the murder at issue, stole their gun for the purpose of shooting the victim, since said evidence was not offered for the

---

[21]*See* State rec., vol. 4 of 4, "Dismissal Without Answer of Application for Post-Conviction Relief" at pp. 5-7.

[22]*See* discussion *supra* at pp. 12-14.

[23]*See* discussion *supra* at pp. 14-18.

impermissible purpose of showing petitioner's "bad character", but rather was offered for the permissible purpose of showing intent, preparation, plan and/or identity.[24]   Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Andy Magee, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this  22nd  day of _____February_____, 2008.


LOUIS MOORE, JR.

United States Magistrate Judge

---

[24]*See* discussion *supra* at pp. 22-23.